1  JOANDARK KASSAB
   10202 Challenge Blvd.
2  La Mesa, CA 91941
   Telephone: (619) 312-3702
3  Email: joandarkkassab@yahoo.com

4  *Plaintiff in Pro Se*

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                   **SOUTHERN DISTRICT OF CALIFORNIA**

10

11 JOANDARK KASSAB, individually,    ) Case No.  **'20 CV2422 WQHBGS**
   and as a trustee of the Kassab Family )
12 2014 Trust,                        )
                                      ) **DEMAND FOR JURY TRIAL**
13                    Plaintiff,      )
                                      ) **COMPLAINT FOR:**
14        v.                          )
                                      )  1. **VIOLATION OF TRUTH-**
15 MUFG UNION BANK, N.A.,             )     **IN-LENDING ACT AND**
                                      )     **REGULATION Z**
16                    Defendant.      )  2. **VIOLATIONS OF EQUAL**
                                      )     **OPPORTUNITY ACT AND**
17                                    )     **REGULATION B**
                                      )  3. **BREACH OF CONTRACT**
18                                    )  4. **VIOLATION OF THE**
                                      )     **CALIFORNIA BUSINESS**
19                                    )     **& PROFESSIONS CODE**
                                      )     **§§ 17200, ET. SEQ.**
20                                    )  5. **DECLARATORY RELIEF**
                                      )
21 _____)

22

23       COMES NOW, Plaintiff Joandark Kassab, individually and as a Trustee of the

24 Kassab Family 2014 Trust ("Plaintiff"), alleges as follows::

25

26 / / /

27

28

## **NATURE OF THE CASE**

1.    Defendant MUFG Union Bank, N.A. ("Union Bank" and/or "Defendant") has extended credit to homeowners in the State of California and across the nation by granting home equity lines of credit ("HELOC").

2.    A HELOC is a revolving form of credit that uses a borrower's home as collateral. Because a home often is a consumer's most valuable asset, many homeowners use home equity credit lines only for major items, such as education, home improvements, or medical bills, and choose not to use them for day-to-day expenses.

3.    Since December 2016, Plaintiff has had a HELOC account established with Union Bank pursuant to a FlexEquity Credit Agreement and Truth in Lending Disclosure Statement (the "Agreement").

4.    On or about December 12, 2019, Union Bank unilaterally terminated Plaintiff's HELOC account in violation of the Truth-in-Lending Act, 15 USC Section 1647(b)(3), and its implementing regulation, Regulation Z, 12 CFR 1026.40(f)(2)), and in breach of the Agreement.

5.    Union Bank's conduct constitutes "unlawful" and "unfair" acts and practices under California's Unfair Competition Law ("UCL"), Business & Professions Code, §§ 17200, *et seq.* As a direct result of Union Bank's conduct, Plaintiff suffered economic injury in the loss of their ability to use their home equity lines of credit and increased cost(s) of credit.

6.    In addition, the Union Bank's terminations of Plaintiff's HELOC accounts are "adverse actions" under the Equal Credit Opportunity Act ("ECOA"), 15 USC Section 1691, et seq. and its implementing regulation, Regulation B, Section 1002.9(b)(2), 12 CFR Section 1002.9(b)(2). Union Bank's Notice of Termination was too vague to accurately notify her of the true and specific reason for the termination in violation of the ECOA and Regulation B.

7.     Plaintiff seeks restitution, declaratory, injunctive, and other equitable relief, and statutory, actual, treble, and punitive damages, reasonable attorneys' fees and costs, and interest, as set forth below.

## THE PARTIES

8.     Plaintiff Joandark Kassab is an individual residing in San Diego County, California, who is also the Trustee of the Kassab Family 2014 Trust.

9.     Plaintiff is informed and believes, and thereupon alleges, that Defendant MUFG Union Bank, N.A. is a national bank organized under the laws of the United States of America, with its main banking offices in San Francisco, California.

10.     Plaintiff is informed and believes, and thereupon alleges, that Union Bank provides banking services, including providing HELOC accounts to consumers throughout the State of California (including in this district) and the United States.

## JURISDICTION AND VENUE

11.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 1640(e), as this action arises in part under the Truth-in-Lending Act and the Equal Credit Opportunity Act.

12.     This Court has supplemental subject matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367.

13.     This Court has personal jurisdiction over Defendant because Defendant does business in and has sufficient minimum contacts with this state, including within this District, and/or has otherwise intentionally availed itself of the markets in this state through the promotion, marketing, and sale of its products and/or services in this state, and in this District, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District and/or the property that is the subject of this action is situated in this District.

COMPLAINT

1

## GENERAL FACTUAL ALLEGATIONS

2

A.    **Union Bank Unilaterally Terminated Plaintiff's HELOC Account in Violation of the Truth-in-Lending Act and Regulation Z, and in Breach of the Agreement**

3

4

5    15.    The Agreement that is the subject of this action ("Agreement") is a

6    written form credit agreement which Plaintiff was required by Defendant Union Bank

7    to sign in order to obtain a HELOC with Union Bank.

8    16.    On or about December 22, 2016, Plaintiff agreed to and executed the

9    Agreement with Union Bank; a true and correct copy of this Agreement signed by

10   Plaintiff is attached hereto as **Exhibit A**.

11   17.    Plaintiff is informed and believes, and thereupon alleges, that Union

12   Bank, including an authorized representative of Defendant Union Bank consented to

13   and agreed to the terms and conditions of the Agreement; and at all times relevant

14   herein, Union Bank and its representatives acted and acknowledged that the

15   Agreement was in full force and effect.

16   18.    The Agreement provides Plaintiff with the contractual right to draw on a

17   credit line account at her own direction and discretion for 120 months (or 10 years)..

18   During the 120-month or other "Draw Period," Plaintiff may receive "Advances," or

19   sums of money that Union Bank has agreed to lend Plaintiff up to the amount of the

20   HELOC Account's credit limit, which was $250,000.00. When a draw is made,

21   Plaintiff must pay back the outstanding balance, plus interest as set forth in the

22   Agreement, to compensate Union Bank for lending the funds. After the termination of

23   the Draw Period, no further Advances are permitted.

24   19.    The Agreement provides the limited set of events which could trigger

25   Union Bank's contractual right to unilaterally terminate a borrower's HELOC

26   Account:

27   **Defaults. Account Termination.** If any of the following events occur,
we may terminate your Account, accelerate the Maturity Date and the

28

-4-

Account Balance, and require you to pay us the entire outstanding Account Balance in one payment, or take other lesser action and charge you certain fees: (a) You engage in fraud or material misrepresentation in connection with this Account; (b) You do not meet the repayment terms of this Agreement; or (c) Your action or inaction adversely affects the Property or our rights in the Property, including but not limited to the following: (i) You sell or transfer all or any part of the Property (or if a beneficial interest in the Property is sold or transferred and Borrower is not a natural person) without our prior written consent; If you convey or assign (except for renting and leasing) or if you transfer, in whole or in part (other than a transfer to a spouse or an inter vivos trust, for which you are a beneficiary) all or any part of the Property without our prior written consent; (ii) You fail to keep the Property insured as we require; (iii) You permit a lien to be filed on the property senior to our Deed of Trust; (iv) You are the sole living Borrower under this Agreement and you die; (v) You fail to pay taxes on the Property when due; (vi) The Property becomes subject to taking through an eminent domain action; or (vii) A prior lien holder commences to foreclose its lien.

*See* Exhibit A, at Section VII.7.

20.    The language of this term closely tracks the provisions of the TILA and Regulation Z, which prohibit lenders from unilaterally terminating a consumer's HELOC accounts and requiring the immediate repayment of any outstanding balance absent certain conditions or "triggering events." *See* 15 U.S.C. § 1647(b); 12 CFR Section 1026.40(f)(2).

21.    Plaintiff is informed and believes, and thereupon alleges, that Union Bank is prohibited from deviating from TILA and Regulation Z, as the Official Staff Commentary to Regulation Z Section 1026.40(f)(2)-1 (12 CFR 1026.40(f)(2)-1) provides that "[c]reditors are not permitted to specify in their contracts any other events that allow termination and acceleration beyond those permitted by the regulation."

22.    On or about December 12, 2019, Union Bank unilaterally terminated Plaintiff's HELOC account based upon conditions or "triggering events" that were

-5-

COMPLAINT

1  not permitted by the TILA, 15 U.S.C. § 1647(b) and Regulation Z, 12 C.F.R. §

2  1026.40(f)(2)) or the terms of the Agreements.

3      23.    Union Bank's "Notice of Termination," which was sent to Plaintiff on or

4  about December 12, 2019, states that the "principal reason(s) for this decision is (are)

5  as follows: "Borrower's actions have had an adverse effect on the security interest.

6  This termination of your account is authorized by your FlexEquity Credit Agreement

7  and Truth In Lending Disclosure Statement executed by you on 12/23/16 and Federal

8  law." A true and correct copy of the December 12, 2019 Notice of Termination which

9  was sent to Plaintiff by Union Bank is attached as **Exhibit B**.

10     24.    However, Plaintiff's actions (or inactions) did not have any adverse

11  effect on Union Bank's security interest in the property.  In fact, in December 2019,

12  Plaintiff was fully compliant with the Agreement and there was no basis for Union

13  Bank to unilaterally terminate her HELOC account.

14     25.    The Official Staff Commentary to Regulation Z provides examples of

15  circumstances of an action or inaction by the consumer that adversely affects the

16  creditor's security for the HELOC, or any right of the creditor in such security, such

17  as if:

18      A.    The consumer transfers title to the property or sells the property
            without the permission of the creditor.
19      B.    The consumer fails to maintain required insurance on the
            dwelling.
20      C.    The consumer fails to pay taxes on the property.
        D.    The consumer permits the filing of a lien senior to that held by the
21            creditor.
        E.    The sole consumer obligated on the plan dies.
22      F.    The property is taken through eminent domain.
        G.    A prior lienholder forecloses.
23
   *See* 12 C.F.R. §1026.40(f)(2)(iii)-1.
24
25     26.    None of the above conditions occurred at the time of the unilateral

26  termination of Plaintiff's HELOC account by Union Bank on or about December 12,

27  2019.  Further, none of the conditions and "triggering events" set forth in the TILA

28

COMPLAINT

and Regulation Z occurred at the time of termination. *See* 15 U.S.C. § 1647(b); 12 CFR Section 1026.40(f)(2).

**B.    Union Bank Failed to Reinstate Plaintiff's Suspended HELOC Account, and/or to Promptly and Reasonably Investigate Whether Conditions for Suspension Continued to Exist, in Violation of the Truth-in-Lending Act and Regulation Z, and in Breach of the Agreements**

27.    Union Bank also violated the TILA and Regulation Z and breached the HELOC Agreement by failing to promptly reinstate Plaintiff's suspended HELOC account when reinstatement was warranted, after Plaintiff requested reinstatement and no condition under which termination or suspension would be permitted under TILA and Regulation Z existed.

28.    Plaintiff is informed and believes, and thereupon alleges, that under the Agreement, Union Bank may temporarily suspend credit privileges for the HELOC account or refuse to make additional extensions of credit or reduce the credit limit if certain conditions or "triggering events" occur, such as if the borrower is in default of a material obligation in the Agreement, among others.  *See* Exhibit A, Section VII.8.

29.    These provisions loosely track the statutory conditions and "triggering events" in which a creditor is permitted to refuse additional extensions of credit or reduce the credit limit applicable to a HELOC account under TILA and Regulation Z. TILA, 15 U.S.C. § 1647(c); Regulation Z, 12 C.F.R. §1026.40(f)(3)(vi)).

30.    Applicable law, including TILA and Regulation B, mandate that creditors reinstate suspended HELOC accounts when the conditions or "triggering events" cease to exist.  The Consumer Financial Protection Bureau's ("CFPB") official interpretation of Regulation Z, section 1026.40(f)(3)(vi), provides that:

> Creditors are permitted to prohibit additional extensions of credit or reduce the credit limit only while one of the designated circumstances exist. When the circumstance justifying the creditor's action ceases to

exist, credit privileges must be reinstated, assuming that no other circumstances permitting such action exists at that time.

12 C.F.R. §1026.40(f)(3)(vi), Suppl. I, ¶2).

31.    Further, the Official Commentary further provides that "[c]reditors are responsible for ensuring that credit privileges are restored *as soon as reasonably possible* after the condition that permitted the creditor's action ceases to exist." *Id.*, ¶4 (emphasis added). It explains that "a creditor can meet this obligation by monitoring the line on an ongoing basis to determine when the condition ceases to exist." *Id.* The creditor may shift the duty to the consumer to request reinstatement of credit privileges by providing a notice under Section 1026.9(c)(1)(iii). *Id.* However, "[o]nce the consumer requests reinstatement, the creditor must promptly investigate to determine whether the condition allowing the freeze continues to exist…" *Id.*

32.    Union Bank was obligated to conduct a reasonable investigation upon a consumer's request for reinstatement under the terms of the Agreement:

> When the reason for which your Account was suspended or credit limit reduced ceases to exist, you may request reinstatement of your credit privileges by submitting the request to us in writing. Once you request reinstatement, we will investigate to determine whether the condition allowing the suspension or reduction continues to exist.

*See* Exhibit A, Section VII.8.

33.    On or about December 6, 2019, Plaintiff requested reinstatement of her HELOC account.

34.    Plaintiff is informed and believes, and thereupon alleges, that Union Bank, however, failed to conduct a reasonable investigation to determine whether the condition allowing the suspension or reduction continues or continued to exist (or ever existed). Plaintiff is informed and believes, and thereupon alleges, that this conduct violated, and continues to violate, TILA and Regulation Z, and is a material breach of the Agreement.

35.     Union Bank did not reinstate, and has not reinstated, Plaintiff's HELOC account even though reinstatement was warranted because no condition under which termination or suspension would be permitted under TILA and Regulation Z existed at the time of Plaintiff's request for reinstatement.  This conduct violated, and continues to violate, TILA and Regulation Z, and is a material breach of the Agreement.

**C.    Union Bank's "Notice of Termination" Violates the Equal Credit Opportunity Act and Regulation B**

36.     Union Bank's unilateral termination of Plaintiff's HELOC account is an "adverse action" under the ECOA and Regulation B. *See* 15 U.S.C. § 1691(d); 12 C.F.R. § 1002.2 (c)(1)(ii).

37.     The "Notice of Termination" provided to Plaintiff by Union Bank violates the ECOA and Regulation B because it does not inform Plaintiff of the specific reasons for the adverse action taken, as required.

38.     Congress initially enacted the ECOA as Title VII of the Consumer Credit Protection Act in order to prohibit credit discrimination on the basis of gender and marital status. *Anderson v. United Finance Co.*, 666 F.2d 1274, 1277 (9th Cir. 1982).  In 1977, the ECOA was expanded to prohibit a creditor from discriminating against any applicant with respect to any aspect of a credit transaction on the basis of race, color, religion, national origin, sex, marital status, or age; or because the applicant receives income from a public assistance program; or in retaliation for exercising a right under the ECOA in good faith. 15 U.S.C. § 1691(a)(1) to (3).

39.     The ECOA's original purpose is "to require that financial institutions and other firms engaged in the extension of credit make that credit equally available to all credit-worthy customers without regard to [the protected classifications]." Pub. L. 93-295, § 502 (1974).

40.      It was amended in 1976 to require creditors to provide applicants with written notice of the specific reasons why adverse action was taken against them in regards to their credit.  In addition to discouraging discriminatory practices, the notice requirement is intended to provide consumers with a "valuable educational benefit" and to allow for the correction of errors "where the creditor may have acted on misinformation or inadequate information."  S. Rep. No. 94-589, at 4 (1976)).

41.      The ECOA specifically requires creditors to provide a written "statement of reasons" for any "adverse action" taken against borrowers, and that notice must "contain[] the specific reasons for the adverse action taken." 15 U.S.C. § 1691(d)(2)-(3).

42.      The creditor has the option of giving the borrower the written "statement of reasons" or a disclosure of the borrower's right to request a "statement of reasons" within 60 days of the notification of adverse action. 15 U.S.C. § 1691(d)(2); 12 C.F.R. §1002.9(a)(2).

43.      Regulation B provides that the notice "must be specific and indicate the principal reason(s) for the adverse action." 12 C.F.R. § 1002.9(b)(2). "Statements that the adverse action was based on the creditor's internal standards or policies or that the applicant, joint applicant, or similar party failed to achieve a qualifying score on the creditor's credit scoring system are insufficient." *Id.*

44.      The CFPB's official interpretation of Regulation B, 12 C.F.R. § 1002.9(b)(2), provides that "the specific reasons disclosed under §§ 1002.9(a)(2) and (b)(2) must relate to and accurately describe the factors actually considered or scored by a creditor." 12 C.F.R. § 1002.9(b)(2), ¶ 2.

45.      The Notice of Termination dated December 12, 2019, which purports to inform Plaintiff of the reason(s) Union Bank terminated their HELOC account, merely states:

This letter is to inform you that access to your available credit line has been terminated. Effective immediately, you will no longer have access to your line of credit, and we will not be able to honor any checks drawn against your account after this date.

**The principal reason(s) for this decision is (are) as follows: Borrower's actions have had an adverse effect on the security interest. This termination of your account is authorized by your FlexEquity Credit Agreement and Truth In Lending Disclosure Statement executed by you on 12/23/16 and Federal law.**

*See* Exhibit B (emphasis added).

46.    The Notice of Termination does not inform Plaintiff of her right to request a "statement of reasons" within 60 days of the notification of adverse action. As a result, it violates the ECOA and Regulation B.

47.    The Notice of Termination also violates ECOA and Regulation B because it is not specific enough (or at all) to educate Plaintiff as to the principal reasons for the termination of her HELOC account with Union Bank.  Union Bank's explanation for the adverse action taken is vague, without any detail as to what Borrower's actions even were that purportedly "had an adverse effect on the security interest," let alone what the purported "adverse effect on the security interest" actually was.  To be sure, the Notice of Termination provided by Union Bank does not accurately describe the factors(s) considered in terminating Plaintiff's HELOC accounts; nor does it identify which terms of the Agreement purportedly authorized the termination.

## **PLAINTIFF**

48.    Plaintiff Kassab is an Arab-American female.  She is 68 years old.  She is also a widow.  Therefore, Plaintiff is informed and believes, and thereupon alleges, that she is a member of several protected classes under the ECOA.

49.    On or about December 2016, Plaintiff obtained a HELOC from Union Bank in the amount of $250,000.00 secured by her primary residence in La Mesa, California (the "Property"). *See* Exhibit A.

COMPLAINT

50.    In or about November 2019, Plaintiff's HELOC account had a zero balance.  Plaintiff attempted to withdraw funds from her HELOC account, but Union Bank denied her access to any such funds.

51.    Union Bank informed her that credit privileges were suspended because it did not receive proof of proper hazard insurance on the Property.

52.    Plaintiff is informed and believes, and thereupon alleges, that Union Bank was already aware that Plaintiff maintained proper hazard insurance on the Property because it was notified by the insurer on an annual basis of the ongoing coverage as Union Bank was listed as the "Loss Payee" on the policy.

53.    Nevertheless, on or about November 27, 2019, Plaintiff sent the requested proof of the proper hazard insurance to Union Bank showing coverage through October 29, 2020.

54.    On or about December 6, 2019, Plaintiff made a written request that Union Bank reinstate her HELOC account.

55.    On or about December 16, 2019, instead of reinstating Plaintiff's HELOC account, Union Bank informed Plaintiff that her HELOC account had been terminated.

56.    Plaintiff subsequently received and discovered that Union Bank also provided Plaintiff a Notice of Termination dated December 12, 2019, which stated:

> This letter is to inform you that access to your available credit line has been terminated. Effective immediately, you will no longer have access to your line of credit, and we will not be able to honor any checks drawn against your account after this date.
>
> The principal reason(s) for this decision is (are) as follows: Borrower's actions have had an adverse effect on the security interest. This termination of your account is authorized by your FlexEquity Credit Agreement and Truth In Lending Disclosure Statement executed by you on 12/23/16 and Federal law.

*See* Exhibit B.

-12-

COMPLAINT

57.    Because Plaintiff had already provided proof of insurance, Plaintiff did not know what the true reason for the termination of her account.  She therefore asked for the reasons once again.

58.    The responses she received from Union Bank, however, created further confusion.

59.    Union Bank's Assistant Vice President acknowledged that although Union Bank did receive the necessary proof of insurance, in accordance with the disclosures agreed to by her at the account opening, the decision was reached to close her HELOC Account.

60.    Union Bank's Assistant Vice President also acknowledged that Plaintiff was informed that the account closure was related to fraud, but that no fraud had occurred.

61.    Based on the foregoing, Plaintiff could not and did not know of the true reasons for her account closure, and she could not determine whether the closure was a result of discriminatory policies or practices.  Nor did she have an opportunity to correct any errors to the extent that Union Bank may have acted on misinformation or inadequate information.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### (Violation of TILA and Regulation Z)

62.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

63.    TILA and Regulation Z prohibit creditors from unilaterally terminating a HELOC and requiring the immediate repayment of any outstanding balance at such time, except in the case of (1) fraud or material misrepresentation on the part of the consumer in connection with the account; 2) failure by the consumer to meet the repayment terms of the agreement for any outstanding balance; or (3) any other

-13-

action or failure to act by the consumer which adversely affects the creditor's security for the account or any right of the creditor in such security. 15 U.S.C. § 1647 (b); 21 CFR 1026.40(f)(2).

64.   The Official Staff Commentary to Regulation Z, 21 CFR 1026(f)(2)(iii), provides examples of circumstances of actions or inactions by the consumer that would adversely affect the creditor's security for the plan, or any right of the creditor in such security.

65.   Union Bank violated the TILA and Regulation Z by suspending and/or terminating Plaintiff's HELOC account and requiring the immediate repayment of any outstanding balance based upon conditions or triggering events that were not permitted by the TILA, 15 USC Section 1647(b), or Regulation Z, Section 1026.40(f)(2) (12 CFR Section 1026.40(f)(2)).

66.   Union Bank violated TILA and Regulation Z, and breached the HELOC Agreement with Plaintiff by suspending and/or terminating Plaintiff's HELOC account in the absence of any act or failure to act by Plaintiff which adversely affected the Union Bank's security for the HELOC account or any right of Union Bank in such security.

67.   Union Bank further violated the TILA and Regulation Z, and breached the HELOC Agreement by failing to reinstate Plaintiff's suspended HELOC account when reinstatement was warranted, because Plaintiff requested reinstatement and no condition under which termination or suspension would be permitted under TILA and Regulation Z existed.

68.   Union Bank's violations of TILA and Regulation Z harmed and continue to harm Plaintiff, including that she lost the ability to use their credit line, lost opportunities and/or other losses related to the loss of such credit and/or monies, and suffered special damages including emotional distress.

COMPLAINT

69.     Defendant Union Bank's foregoing conduct, which Plaintiff is informed and believes, and thereupon alleges, was conducted by and/or endorsed and/or approved by and/or at the direction of management and/or those in authority at Union Bank, including but not limited to its Assistant Vice President, was malicious and oppressive, and done with the deliberate intent of harassing, annoying, injuring and/or embarrassing Plaintiff and causing Plaintiff to suffer severe emotional distress and/or other financial losses.  Accordingly, Plaintiff is entitled to an award of punitive and/or exemplary damages.

70.     As a result of Union Bank's violations and actions and/or failures as alleged above, Plaintiff seeks and is entitled to: injunctive relief, including but not limited to an order enjoining Union Bank from such future misconduct and requiring Union Bank to reinstate Plaintiff's HELOC account; actual damages under 15 U.S.C. § 1640(a)(1); statutory damages under 15 U.S.C. § 1640(a)(2); and costs of the action, together with reasonable attorneys' fees under 15 U.S.C. § 1640(a)(3).

## SECOND CLAIM FOR RELIEF

### (Violations of ECOA and Regulation B)

71.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

72.     The ECOA defines a creditor as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e).

73.     Regulation B defines creditor in a similar way: "Creditor means a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit."

-15-
COMPLAINT

74.    Union Bank is a "creditor" under the ECOA and Regulation B because it regularly extends, renews, or continues home equity lines of credit or regularly arranges for the extension, renewal, or continuation of home equity lines of credit.

75.    Plaintiff is an "applicant" under 5 U.S.C.A. § 1691a (b) and Regulation B, 12 C.F.R. § 1002.2  because she received an extension of credit from Union Bank and became contractually liable to Union Bank regarding such extension(s) of credit

76.    ECOA defines an adverse action as "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested." 15 U.S.C. § 1691(d). Regulation B defines adverse action as "[a] termination of an account or an unfavorable change in the terms of an account that does not affect all or substantially all of a class of the creditor's accounts." 12 C.F.R. § 1002.2 (c)(1)(ii).As alleged above, the termination of Plaintiff's HELOC account by Union Bank was an adverse action under ECOA and Regulation B, 12 C.F.R. § 1002.2(c), undertaken and/or maintained in violation of the ECOA and Regulation B.

77.    Union Bank's violations of the ECOA and Regulation B harmed and continue to harm Plaintiff and has damaged Plaintiff in an amount to be proven at trial.

78.    Defendant Union Bank's foregoing conduct, which Plaintiff is informed and believes, and thereupon alleges, was conducted by and/or endorsed and/or approved by and/or at the direction of management and/or those in authority at Union Bank, including but not limited to its Assistant Vice President, was malicious and oppressive, and done with the deliberate intent of harassing, annoying, injuring and/or embarrassing Plaintiff and causing Plaintiff to suffer severe emotional distress and/or other financial losses.  Accordingly, Plaintiff is entitled to an award of punitive and/or exemplary damages.

79.     As a result of Union Bank's violations and actions and/or failures as alleged above, Plaintiff seeks actual and punitive damages pursuant to 15 U.S.C. § 1691e(a) and (b); declaratory and injunctive relief pursuant to 15 U.S.C. § 1691e(c),including an order enjoining Union Bank's violation of ECOA and Regulation B and an order requiring Union Bank to notify Plaintiff of the specific reason(s) why the adverse action was taken against her; and reasonable costs of the action, together with a reasonable attorney's fee as determined by the Court, under 15 U.S.C. § 1691e(d).

## THIRD CLAIM FOR RELIEF

### (Breach of Contract)

80.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

81.     Plaintiff obtained a HELOC from Union Bank by signing the HELOC Agreement attached hereto as Exhibit A, which is a valid contract between Defendant Union Bank and Plaintiff.

82.     The governing HELOC Agreement contain a term that purports to give Union Bank the discretion to terminate the HELOC account if the borrower's "action or inaction adversely affects the Property or [Union Bank's] rights in the Property..."

83.     The credit limit under the Plaintiff's HELOC Agreement, as well as the conditions under which Union Bank could purportedly terminate credit limits, were material terms of the contract between Union Bank and Plaintiff.

84.     Union Bank breached the HELOC Agreement by using grounds not permitted by the terms of the HELOC Agreement, including improper triggering events, to unilaterally terminate the Plaintiff's HELOC account, and by failing to reinstate Plaintiff's HELOC account when the reinstatement was warranted.

85.     Plaintiff made all payments due to Union Bank, and has otherwise fully performed under her Agreement with Union Bank.

-17-

COMPLAINT

86.     As a result of Union Bank's breach of the Agreement, Plaintiff has suffered damages in the form of being denied use of the credit agreed to and extended to her by Union Bank, and/or lost opportunities and/or other losses related to the loss of such credit and/or monies.

87.     Plaintiff seeks actual and compensatory damages for Defendant's breach of contract in the amount to be determined at trial, plus reinstatement of the HELOC account that was suspended or reduced in breach of the Agreement, as well as pre- and post-judgement interest, attorneys' fees (as permitted under the agreements with Defendant), and costs.

## FOURTH CLAIM FOR RELIEF

### (Violation of the California Business & Professions Code §§ 17200, et seq.)

88.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

89.     California's Unfair Competition Law (the "UCL"), California Business & Professions Code, sections 17200, et seq., prohibits "unfair competition," which is defined as any "unlawful, unfair or fraudulent business act or practice."

90.     As set forth and alleged above and herein, Union Bank has, and continues to, engage in "unlawful" and "unfair" business acts and/or practices within the meaning of the UCL.

91.     Union Bank's business acts and practices are "unlawful" because they fail to comply with the TILA and Regulation B, and because they have violated the ECOA and Regulation B, as alleged herein.

92.     As alleged above, Union Bank's policies and practices, which are "unfair business acts or practices" under the UCL, include but are not limited to: (1) failing to promptly investigate and reasonably investigate whether the condition allowing Union Bank to freeze Plaintiff's HELOC account continued to exist; (2) failing to promptly reinstate the Plaintiff's HELOC account after conducting such an

investigation and finding that the conditions ceased to exist; and (3) terminating the HELOC account based upon conditions or "triggering events" neither permitted by the TILA, Regulation Z, nor the terms of the HELOC Agreement.

93. The gravity of the harm to Plaintiff outweighs any arguable utility of Union Bank's conduct.

94. Plaintiff's injuries are substantial, are not outweighed by any countervailing benefit to consumers or competition, and are not ones that consumers could have reasonably avoided.

95. Union Bank's conduct offends California public policy tethered to the TILA and Regulation Z.

96. Union Bank's violations of the TILA and Regulation B violates the policy and spirit of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

97. Union Bank's actions are immoral, unethical, and/or unscrupulous, and offend established public policy, and have substantially injured Plaintiff.

98. Union Bank has other reasonably available alternatives to further their legitimate business interests other than the conduct described herein, such as conducting a prompt and reasonable investigation into whether reinstatement of Plaintiff's HELOC account is warranted.

99. As a result of Union Bank's unlawful and unfair business practices, Plaintiff has suffered a monetary loss by losing the credit that Union Bank had extended to her, and lost opportunities and/or other losses related to the loss of such credit; and suffered special damages, including emotional distress.

100. Pursuant to Section 17203 of the UCL, Plaintiff seeks injunctive or other equitable relief, including an order enjoining Union Bank from such future misconduct and requiring Union Bank to reinstate Plaintiff's HELOC account, and

any other such orders that may be necessary to rectify the unlawful or unfair business practices of Defendant Union Bank.

101.   Plaintiff brings this action as private attorneys general and to vindicate and enforce an important right affecting the public interest. Plaintiff is therefore entitled to an award of attorneys' fees under Code of Civil Proc. § 1021.5 for bringing this action.

## FIFTH CLAIM FOR RELIEF

### (Declaratory Relief Under TILA and Regulation Z)

102.   Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

103.   Plaintiff brings this claim as an alternative to her First Claim for Relief above and seeks declaratory relief in the event this Court finds at any time that damages or other remedies under TILA, as prayed for in the First Claim for Relief, would be inadequate to fully compensate Plaintiff or would otherwise be inadequate to fully address Union Bank's ongoing or future violations of TILA with respect to its existing and future borrowers.

104.   Plaintiff and Union Bank have adverse legal interests, and there is a substantial controversy between Plaintiff and Defendant of sufficient immediacy and reality to warrant the issuance of a declaratory judgment as to whether Union Bank's termination of HELOC accounts (like Plaintiff's) violate TILA and Regulation Z.

105.   Plaintiff requests that the Court declare, pursuant to 28 U.S.C. § 2201, that Union Bank violated TILA and Regulation Z and breached Plaintiff's HELOC Agreement by using unlawful triggering events to unilaterally terminate her HELOC account and by failing to reinstate the HELOC account when reinstatement was warranted.

/ / /

/ / /

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff prays for:

a)   Reinstatement of her HELOC account;

b)   Declaratory and injunctive relief as stated herein;

c)   For actual, special, statutory, punitive, and treble damages for all applicable claims in amounts to be proven at trial;

d)   For an order permanently enjoining Union Bank from engaging in the unlawful practices alleged herein;

e)   For any and all other relief available under the various statutory causes of action asserted herein;

f)   For an award of attorneys' fees, costs, and expenses;

g)   For an award of pre- and post-judgment interest; and

h)   For such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands trial by jury of all issues so triable.

Respectfully submitted,

Dated: December 11, 2020          By: _____

JOANDARK KASSAB, individually
and as Trustee of the Kassab Family
2014 Trust, Plaintiff in Pro Se

-21-

COMPLAINT

EXHIBIT A

FLEXEQUITY™ CREDIT AGREEMENT AND TRUTH IN LENDING DISCLOSURE STATEMENT

| | | | |
|---|---|---|---|
| Borrower: | | Co-Borrower: | |
| Borrower: | | Co-Borrower: | |
| Borrower's Address: 10202 CHALLENGE BLVD, LA MESA, CA 91941 | | | |
| Agreement Date: 12/22/2018 | Credit Limit: $250,000.00 | | Checked By: |

**NOTICE: THIS DOCUMENT CONTAINS PROVISIONS FOR A VARIABLE INTEREST RATE**

**SECTION I - TYPE OF ACCOUNT AND GENERAL INFORMATION**

This FlexEquity Credit Agreement and Truth in Lending Disclosure Statement ("Agreement") governs the use of your FlexEquity™ Account (the "Account"). The terms "you" and "your" refer to each person who signs below and anyone you permit to use your Account. The terms "we", "us" and "our" refer to MUFG MUFG Union Bank, N.A., and its successors and assigns. Your obligations under this Agreement are secured by a Deed of Trust dated the same date as this Agreement and secured by the real Property ("Property") located at: 10202 CHALLENGE BLVD, LA MESA, CA 91941.

This is a personal line of credit secured by your home which we are making available to you to obtain Advances up to the Credit Limit on the terms and conditions contained in this Agreement. You will be able to obtain Advances from time to time, and in such amounts that we may advance and re-advance to you up to the Credit Limit, subject to the terms of this Agreement.

**1. Definitions** - Many of the terms we use in this Agreement have special meanings:

"Account" means the Line of Credit account established by this Agreement.
"Account Balance" means the sum of the unpaid principal of Advances made under your Line of Credit, plus unpaid but earned finance charges, plus any costs, expenses, and fees that are due.
"Advance" means sums we lend to you under your Account in accordance with the terms of this Agreement.
"Billing Cycle" means the period of time during which your Account is normally covered by Periodic Billing Statements and includes such period of time even when a statement is not sent because your Account Balance is $0.00 for that period.
"Credit Limit" means the maximum amount of principal shown above that we will ordinarily allow you to owe us at any time under this Agreement.
"Checks" means the checks used to access the Line of Credit funds during the Draw Period.
"Draw Period" means the period of time during which you can receive Advances under this Agreement. The Draw Period for your Account begins on the Agreement Date shown above and ends 120 months thereafter.
"Draw Period Expiration Date" means the date on which your Draw Period ends.
"Fixed Rate Option Plan(s)" means those portions of your Account Balance that are subject to a fixed interest rate and fixed term and that are repayable in substantially equal monthly payments of principal and interest.
"Fixed Rate Option Transfer Date" means each date on which we transfer all or any portion of your Account Balance to a Fixed Rate Option Plan, pursuant and subject to the provisions of this Agreement.
"Line of Credit" means the home equity line of credit we offer you pursuant to the terms of this Agreement.
"Maturity Date" means the date on which you must pay us, in full, all amounts owing on your Account, including all unpaid principal, accrued and unpaid Finance Charges, costs, fees, and charges, as described in Section I.3.a.
"Minimum Advance" means the smallest amount of money we will advance to you under this Agreement.
"Minimum Monthly Payment" means the minimum payment you must make each month on the Account, as reflected on each Periodic Billing Statement we will deliver to you for each Billing Cycle, and determined in accordance with Section V.1.
"Periodic Billing Statement" means the statement we will send you at the end of each Billing Cycle informing you of the Minimum Monthly Payment, and other information relating to your Account.
"Payment Due Date" means the date you must make the monthly payment on your Account, which date we will specify in your Periodic Billing Statement.
"Repayment Period" means the period that commences on the day following the Draw Period Expiration Date and ends on the Maturity Date.
"Variable Rate Plan" refers to the portion of your Account that, during the Draw Period, will be subject to a finance charge at a variable interest rate.

**2. Draw and Repayment Periods**

Your rights and obligations under the Account will differ depending on whether your Account is in the Draw Period or the Repayment Period.

a.  Draw Period - Variable Rate Plan. During the Draw Period, the Variable Rate Plan portion of the Account, which is any portion that you do not transfer to a Fixed Rate Option Plan in accordance with Section I.2.c of this Agreement, will be subject to a Finance Charge at a variable interest rate.

The interest rate on the Variable Rate Plan is tied to an index to which a margin is added. That interest rate may change each Billing Cycle. The interest rate, index and margin for the Variable Rate Plan portion are described in Section II.

During the Draw Period, when you repay Advances, those repaid amounts become available to you again for additional Advances under the Variable Rate Plan up to your available Credit Limit, unless (i) an event of default has occurred; (ii) we exercise our rights to suspend or terminate the Account in accordance with Sections VII.7 and VII.8 of this Agreement, or (iii) you exercise your rights to terminate your Account.

Effective as of the Draw Period Expiration Date, you will not be permitted to obtain any additional Advances. You must continue to make scheduled payments on the Account Balance outstanding as of the Draw Period Expiration Date.

If we have the right to terminate your Account under Section VII.7 of this Agreement, we may, in our sole discretion, either terminate your Account in accordance with Section VII.7 or take other actions permitted by law which, during the Draw Period, may include suspending your right to future advances and/or transferring the Variable Rate Plan portion of the Account Balance to a Fixed Rate Option Plan with a maximum term of 240 months.

b.  Draw Period - Fixed Rate Option Plan(s). Through the Draw Period Expiration Date, subject to the provisions of this Agreement, you may transfer all or a portion of your outstanding Account Balance under the Variable Rate Plan to up to four (4) fixed interest rate, sub-accounts (the "Fixed Rate Option Plan(s)") in accordance with Section I.2.c below. You may make such a transfer only once in any 365-day period.

Each Fixed Rate Option Plan will be repayable in substantially equal monthly payments of principal and interest over 240 months (or such shorter period as you select at your option) from the date that balance is transferred to the Fixed Rate Option Plan. The Annual Percentage Rate for each Fixed Rate Option Plan will be determined on each applicable Fixed Rate Option Transfer Date and will be equal to the sum of an index and margin in effect on the applicable Fixed Rate Option Transfer Date, as set forth in Section II below

c.  Draw Period - Transferring Account Balance(s) to a Fixed Rate Option Plan. To transfer all or a portion of your outstanding Account Balance from the Variable Rate Plan or an existing Fixed Rate Option Plan to one or more Fixed Rate Option Plans, you must notify us in person or in writing at the address or telephone number shown on your monthly Periodic Billing Statement. You must tell us the amount of the Account Balance that you want transferred.

You may make one transfer to a Fixed Rate Option Plan no more than once in any 365-day period. You may use any one of the following transfer options:

(i) You may transfer all or a portion of your Variable Rate Plan balance to a new Fixed Rate Option Plan.
(ii) You may transfer all or a portion of your Variable Rate Plan balance to any existing Fixed Rate Option Plan.
(iii) You may combine all of a portion of your Variable Rate Plan balance and one or more Fixed Rate Option Plan balances into one Fixed Rate Option Plan balance.
(iv) You may combine the outstanding balances under one or more Fixed Rate Option Plans into a single Fixed Rate Option Plan.

You may choose a different amortization period option for each Fixed Rate Option Plan, provided that no Fixed Rate Option Plan may have an amortization period greater than 240 months. You must notify us if you wish to exercise an amortization option of less than 240 months for any or all of the Fixed Rate Option Plans.

If you have any balances remaining on your Variable Rate Plan as of the Draw Period Expiration Date, this balance will automatically be converted on the day following the Draw Period Expiration Date to a new Fixed Rate Option Plan in accordance with Sections I.2.b and I.2.c, at the

(1) if any portion of the Account Balance is one or more Variable Rate Plans, 240 months following the Draw Period Expiration Date; or

(2) if the only remaining portion(s) of the Account Balance is one or more Fixed Rate Plans, the due date of your last scheduled payment on the Fixed Rate Option Plan with the longest remaining amortization period.

If on the Draw Period Expiration Date there is no outstanding Account Balance, the Maturity Date for your Account will be the Draw Period Expiration Date.

ii. Repayment Period Repayment Options - The interest rate you must pay us during the Repayment Period on any remaining balance under the Variable Rate Plan will be equal to the sum of an index and a margin as described in Section II. The interest rate will be determined based on the options you select pursuant to Section I.2.b and applicable Annual Percentage Rate(s) determined under Section II, at the Draw Period Expiration Date.

## SECTION II – ANNUAL PERCENTAGE RATE AND FINANCE CHARGES

### 1. ANNUAL PERCENTAGE RATE

The "Annual Percentage Rate" is the cost to you of the credit extended expressed as an annual rate of interest. The Annual Percentage Rate is a simple interest rate. The Annual Percentage Rate includes only interest and no other costs.

Your FlexEquity is subject to an initial promotional Annual Percentage Rate (the "Promotional Annual Percentage Rate") commencing on the Date your account is opened and expiring 6 months later (the "Promotional Rate Period"). This Promotional Annual Percentage Rate, which will be fixed during the Promotional Rate Period, is 1.49% which corresponds to a daily periodic rate of 0.000041. At the end of the Promotional Rate Period your Annual Percentage Rate will be as described in the following paragraphs. This Promotional Annual Percentage Rate will apply to the Variable Rate Plan and no other discounts will be applicable during this Promotional Rate Period.

During the Promotional Rate Period, the portion of the Minimum Monthly Payment applicable to any outstanding Variable Rate Plan balance will be the sum of (a) the Finance Charges assessed on the Variable Rate Plan balance during the Billing Cycle; (b) any past due amounts, unpaid fees and unpaid charges. Refer to Section V below for more information on the Minimum Monthly Payment.

Following the Promotional Rate Period applicable to the Variable Rate Plan as described above, and as of the Agreement Date for any Fixed Rate Option Plan established on the Agreement Date, the Annual Percentage Rate for your Account, which will be based on the sum of the applicable index plus margin (as described in this Section II) is as follows:

For the Variable Rate Plan, 4.240 %, which corresponds to a daily periodic rate of 0.000116.

For any Fixed Rate Option Plan established on the Agreement Date,
6.240 %, which corresponds to a daily periodic rate of 0.000170 for initial balances of up to $34,999.99; and
5.240 %, which corresponds to a daily periodic rate of 0.000143 for initial balances of $35,000.00 to $2,000,000.00.

For any Fixed Rate Option Plan established after the Agreement Date, including on the day following the Draw Period Expiration Date, the applicable annual and daily periodic rates cannot be determined in advance, but will be calculated in accordance with this Section II.

### 2. Periodic FINANCE CHARGE

Calculation of Finance Charges – You agree to pay periodic Finance Charges (which we may also refer to as "interest") on the Variable Rate Plan balance and any Fixed Rate Option Plan balances based on the Annual Percentage Rate (corresponding to a daily periodic rate) applicable to each such Plan calculated in accordance with Section I and this Section II. The Annual Percentage Rate (corresponding to a daily periodic rate) for any Variable Rate Plan will equal the value of an index in effect on the first day of the Billing Cycle plus a specified number of percentage points (a "margin"), as determined in accordance with Section II.3 below. The Annual Percentage Rate for any Fixed Rate Option Plan will equal the value of an index plus a specified number of percentage points (a "margin"), as determined in accordance with Section II.4 below.

Finance Charges will begin to accrue on the day that your Account is debited for each Advance, and will continue to accrue until the day the outstanding Account Balance is paid in full. We calculate the Finance Charge on any Plan under your Account by applying the daily periodic rate for each Billing Cycle to the average daily balance on that Plan for the total number of days in the Billing Cycle. To determine the daily periodic rate, we divide the Annual Percentage Rate in effect for the Billing Cycle by 365 (or by 366 in a leap year).

To obtain the average daily balance (including new debits) on the Variable Rate Plan portion of your Account Balance we:

(i) start with each day's beginning principal balance of the Variable Rate Plan portion of your Account (excluding all unpaid Finance Charges, any unpaid annual fee and any unpaid late charges);

(ii) add any new Advances and Checks written or other debits posted to your Account that day, excluding late charges, credit insurance premiums, and returned check fees;

(iii) subtract any payments and/or credits posted that day; and

(iv) add the sum of outstanding balances for each day of the Billing Cycle and then divide that sum by the number of days in the Billing Cycle.

To obtain the average daily balance (including new debits) on any Fixed Rate Option Plan portion of your Account Balance we:

(i) start with each day's beginning principal balance of the applicable Fixed Rate Option Plan portion of your Account (excluding all unpaid Finance Charges and any unpaid late charges);

(ii) add any new debits posted to the applicable Fixed Rate Option Plan that day, excluding late charges, credit insurance premiums, and returned check fees;

(iii) subtract any payments and/or credits posted that day; and

(iv) add the sum of outstanding balances for each day of the Billing Cycle and then divide that sum by the number of days in the Billing Cycle.

These result in your average daily balance for each day in the Billing Cycle for that Fixed Rate Option Plan portion of your Account Balance. For each Fixed Rate Option Plan under your Account, we then determine the Finance Charge for each day by multiplying the daily balance of the Plan for each day by the daily periodic rate. These daily Finance Charges are added together to obtain the total periodic Finance Charge for that Fixed Rate Option Plan for the period covered by the Billing Cycle. Each Plan's periodic Finance Charge is then added together to arrive at the periodic Finance Charge for the entire Account for the period covered by the Billing Cycle.

3. Variable Rate Plan – The interest rate on your Variable Rate Plan is variable and, as a result, the Annual Percentage Rate (determined by applying the daily periodic rate to the average daily balance as described above) and your periodic payment may change.

The Annual Percentage Rate (corresponding to a daily periodic rate) on your Variable Rate Plan will equal the sum of .490 percentage points (the "Variable Rate Margin") plus the value of an index (the "Variable Rate Index") in effect on the first day of the Billing Cycle (as described in the next sentence). The Variable Rate Index is the Prime Rate as published in the print edition of the Wall Street Journal and shown as "Prime Rate", or substantially similar words. If more than one rate is published, we will use the higher rate.

The interest rate on the Variable Rate Plan portion of your Account during the Draw Period may change from time to time based upon changes in the Variable Rate Index. If the Variable Rate Index increases or decreases, the Daily Periodic Rate, the Annual Percentage Rate and the scheduled payment on your Variable Rate Plan will increase or decrease. The interest rate is adjusted on the first day of each Billing Cycle. This rate will remain in effect until the first day of the next Billing Cycle. The Variable Rate Plan is subject to a minimum and maximum Annual Percentage Rate as set forth in Section III below.

4. Fixed Rate Plan and Repayment Period – The Annual Percentage Rate on each of your Fixed Rate Option Plans, including any Fixed Rate Option Plan established on the day following the Draw Period Expiration Date, will be established on the Fixed Rate Option Plan Transfer Date and will equal the sum of the percentage points specified below (the "Fixed Rate Margin") plus an index. We will assign a Fixed Rate Margin on the due date the Fixed Rate Option Plan is established. We will establish the Fixed Rate Margin by reference to the principal balance of the Fixed Rate Option Plan, as follows:

| Principal Balance of $5,000 to $34,999.99 | Principal Balance of $35,000.00 to $2,000,000.00 |
|---|---|
| Fixed Rate Margin | Fixed Rate Margin |

Subject to Section III, you may make a reduced Fix Rate Option Plan and Repayment Periods as available from time to time. You may obtain terms/rates for the Fixed Rate Option Plan and Repayment Period balance by contacting Customer Service.

Once the Annual Percentage Rate is established on a Fixed Rate Option Transfer Date, it will remain fixed until any subsequent Fixed Rate Option Transfer Date for that Fixed Rate Option Plan. Upon each Fixed Rate Option Transfer Date, a new Annual Percentage Rate will be established using the Fixed Rate Index and Fixed Rate Index Margin as described above. Each Fixed Rate Option Plan is subject to a minimum and maximum Annual Percentage Rate as set forth in Section III below. The Finance Charge is reflected on your Periodic Billing Statement for any Fixed Rate Option Plan portion of the Account represents the sum of the daily periodic rate Finance Charges that have accrued with respect to that Fixed Rate Option Plan from your last payment through the end of the Billing Cycle.

**SECTION III – LIMITS ON INCREASES AND DECREASES IN YOUR ANNUAL PERCENTAGE RATE**

**Minimum and Maximum ANNUAL PERCENTAGE RATE** – The Annual Percentage Rate applicable to your Account Balance will never be less than 3.24% nor more than 18.00%.

**SECTION IV – CHARGES OTHER THAN FINANCE CHARGES**

1. **At Opening** – You agree to pay the following charges in connection with your Account when you open your Account.

| (*means estimate) | Paid by you in Cash | Charged to your Account |
|---|---|---|
| Appraisal | $ 0.00 | $ 0.00 |
| Title Insurance | $ 0.00 | $ 0.00 |
| Tax Service Fee | $ 0.00 | $ 0.00 |
| Recording Fee for Deed of Trust | $ 0.00 | $ 0.00 |
| Flood Determination Fee | $ 0.00 | $ 0.00 |
| Other ___ | $0.00 | $0.00 |

2. **Administrative Charges** – You agree to pay for Advances we make to you or on your behalf, including to satisfy your obligations under the Deed of Trust or this Agreement. You also agree to pay, from time to time, special handling fees to cover our costs in servicing your Account, including in connection with such matters as (i) if you request photocopies of Checks or statements for your Account, (ii) if you request a stop payment for a Check on your Account, or (iii) if you request us to perform research regarding your Account. You agree that all such special handling fees will be based on our then current fee schedules and may be added to your Account Balance.

3. **Returned Check Charge** – You agree to pay a returned check charge if any check you use to pay us is returned because of insufficient funds or otherwise dishonored. You agree to pay any of our required charges for any Check detoo you authorize us to make.

4. **Late Charges** – If we do not receive your scheduled payment on any portion of your Account within 15 days following the Payment Due Date shown on the Periodic Billing Statement, we may assess a late payment fee to your Account of 5% of the Minimum Monthly Payment amount (but not less than $5 and not more than $26). This late charge shall apply to the sum of all balances under the Variable Rate Plan and the Fixed Rate Option Plan.

5. **Early Termination Fee** – If you close your Account and your Account Balance is paid in full on or before the thirty-six month anniversary of the Agreement Date, you agree to pay us an early termination fee of $ 350.00. Among other things, this fee is intended to cover our costs of originating, processing and administering your Account. We will waive this fee in its entirely if you close your Account to obtain a loan from us to refinance your existing loan(s) secured by the Property. We will refund the fee to you if you close the Account because you are selling the Property, and you obtain a new residential mortgage loan from us within six months of the date you close the Account, provided you provide us evidence that you paid the fee at the time you apply for the new loan. We will refund the fee at the time of closing of the new loan.

6. **Annual Fee** – You agree to pay an annual fee of $50.00 for each twelve-month period during the Draw Period. The fee will be debited against your Account on or after the first day of the thirteenth Billing Cycle, and every twelfth Billing Cycle thereafter. We will waive the annual fee if the average daily balance during the preceding twelve months exceeds the sum of Nine Thousand Dollars ($9,000). To obtain the average daily balance (excluding new debits) on your Account for this purpose, we:

   (i) add the average daily balance of the Variable Rate Plan and all Fixed Rate Option Plans, determined in accordance with Section 8.2, for each day in the preceding twelve billing cycles, and

   (ii) divide that sum by the number of days in the preceding twelve billing cycles.

**SECTION V – MINIMUM MONTHLY PAYMENTS DURING THE DRAW PERIOD AND REPAYMENT PERIOD**

1. **General** – Your Minimum Monthly Payment will consist of the sum of (a) and (b) below:

   (a) the monthly payment on the Variable Rate Plan as described in Section V.2 below, but not less than $100 so long as the sum of the following equals or exceeds $100: (i) the amount determined pursuant to Section V.2, plus (ii) any outstanding principal balance on the Variable Rate Plan, and

   (b) the scheduled monthly payments on all Fixed Rate Option Plans.

You must make your Minimum Monthly Payment on the Payment Due Date. We will apply your payments as of the date we receive them, using a simple interest formula. This means that if your Minimum Monthly Payment is not made on the Payment Due Date, your Minimum Monthly Payment may be insufficient to pay the full amount of interest then accrued in the Variable Rate Plan, which could result in a final balloon payment on your Account that is substantially higher than your prior monthly payment amounts. Furthermore, paying only the Minimum Monthly Payment during the Draw Period will not reduce the principal balance that is outstanding on the Variable Rate Plan portion of your Account, even if you make your payment on the Payment Due Date.

We will apply payments we receive first to satisfy payment on the Variable Rate Plan portion of the Account, and then to satisfy the payment on any Fixed Rate Option Plan portions of the Account, starting with the oldest Fixed Rate Option Plan, and then to the next oldest, and so on, and finally to any fees or charges that may have been assessed to your Account and which are not included in the Minimum Monthly Payment.

2. **Variable Rate Plan Monthly Payments** – During the Promotional Rate Period, the portion of the Minimum Monthly Payment applicable to any outstanding Variable Rate Plan balance will be the sum of

   (a) the amount equal to the Finance Charge assessed on the Variable Rate Plan balance during the Billing Cycle, and

   (b) any past due amounts, unpaid fees and unpaid charges.

After the Promotional Rate Period expires, and for the remainder of the Draw Period, the portion of the Minimum Monthly Payment applicable to any outstanding Variable Rate Plan balance will be the sum of

   (a) the amount equal to the Finance Charge assessed on the Variable Rate Plan balance during the Billing Cycle, and

   (b) any past due amounts.

We will apply the payments we receive first to the Variable Rate Plan portion of your Account in the following order, billed interest, then billed principal due under the Variable Rate Plan, and finally to any fees or charges that may have been assessed to your Account and which are not included in the Minimum Monthly Payment.

3. **Fixed Rate Option Plan / Payments** – You must make a monthly payment for each Fixed Rate Option Plan for which there is an outstanding balance, calculated in accordance with Section 1.2.c of this Agreement. After we have applied your monthly payment to sums due under the Variable Rate Plan as set forth in Section V.2 above, we will apply the remaining portion of the monthly payment to the sums due under the Fixed Rate Option Plan portion of your Account in the following order: billed interest and then billed principal due under the Fixed Rate Option Plans (starting with the oldest Fixed Rate Option Plan, and then to the next oldest), and any past payment fees relating to the Variable Rate Plan and all Fixed Rate Option Plans, other charges relating to the Variable Rate Plan and all Fixed Rate Option Plans, and miscellaneous fees relating to the Variable Rate Plan and all Fixed Rate Option Plans. If there is any amount remaining following the application of the payments in accordance with Section V.2 and V.3, we will apply the remaining portion of the payment to reduce the Variable Rate Plan portion of the Account Balance, and then to reduce the principal of each Fixed Rate Option Plan, deducted first from the oldest Fixed Rate Option Plan, and then to the next oldest, and so on.

8. **Irregular Payments** – We can accept late payments, partial payments, drafts, checks or money orders which are marked as "payment in full or similar language" without losing any of our rights under the Agreement.

* Address for Payments – Payments should be made to the address shown on your Periodic Billing Statement, or on any bills, coupons and payment books we provide you from time to time.

**SECTION VI – AUTOMATIC PAYMENT INTEREST RATE**

☑ **Automatic Payment Option** – If this box is checked, you have elected automatic payment from a MUFG Union Bank, N.A. checking or savings account for both the Variable Rate Plan and all of the Fixed Rate Option Plan balances during the Draw Period and Repayment Period. To effect this election, you must sign a consent form we will provide you. If you elect automatic payment, the Annual Percentage Rate applied to any outstanding Account Balance will be reduced by one quarter of 1 percent (0.25%). Rate reductions will apply only for the period of time payments are made by automatic transfer. If your payments cease to be made by automatic transfer from your MUFG Union Bank, N.A. account (regardless of whether you or we cancel the automatic payment option), any previously reduced Annual Percentage Rate will be increased by one quarter of 1 percent (0.25%) effective as of the date the automatic payments are canceled. This will result in a corresponding increase in the Finance Charge and Annual Percentage Rate for your Account and in your monthly payments. Either you or we may terminate the automatic payment by giving written notice to the non-terminating party. Any such notice you give us must be in accordance with Section VII.18. We may give you notice by United States mail addressed to the address we have for you in our records.

**SECTION VII – ACCOUNT TERMS**

1. **Credit Limit** – The Credit Limit on your Account is the amount shown in the box at the top of this Agreement. The Credit Limit is the maximum amount of principal we will ordinarily allow you to owe us under your Account at any time. As you use the Account, all Checks and Advances will be debited against this Credit Limit. Any amounts you need to transfer to a Fixed Rate Option Plan will also be deducted from your Credit Limit. You agree that you will not permit the amount you owe us on the Account at any one time to exceed the Credit Limit. We may, but are not obligated to, honor any Checks presented which, when added to the unpaid balance of your Account, would cause you to exceed your Credit Limit. You will pay immediately, upon our request, the amount by which you have exceeded your Credit Limit.

2. **Borrowing Money** – During the Draw Period, you may request Advances on your Account in an amount up to the unused portion of your Credit Limit by writing Checks which we give you. You agree not to write any Checks on your Account for an amount less than $500. We may, but are not obligated to, pay any Check for less than this amount. You also agree not to write any Check to make a payment on your Account. We will charge to your Account each Check we pay and will reduce the Available Credit by that amount. If we make access to your Account available to you by telephone or personal computer ("PC"), your Account will continue to be governed by this Agreement. You will also be bound by any telephone or PC access agreements you sign with us. The term "Check" also includes Advances on your Account obtained by telephone or PC access.

3. **Promise to Pay** – You promise to pay us, according to the terms of this Agreement, for all Checks, Advances, debts, Finance Charges, and any other charges which may be assessed to your Account, including Checks written by anyone else you permit to use your Account, even if that person did not sign this Agreement.

4. **Statements** – You will be sent a Periodic Billing Statement for each Billing Cycle in which there is a debit or credit balance on your Account. The Periodic Billing Statement will show your Credit Limit, previous balance, dates and amount of Checks charged to the Account during the Billing Cycle, late charges and other charges, payments and other credits, the amount of any Finance Charge imposed during the Billing Cycle, the new balance of your Account, the amount of the Minimum Monthly Payment, and the Payment Due Date by which we must receive your payment. You agree to examine your Periodic Billing Statement upon receipt and notify us promptly of any transactions you believe are improper or unauthorized.

5. **Property Insurance** – You agree to keep the Property insured in such amounts as we require against losses and damage to the Property, including but not limited to those caused by fire and, if we require it, flood. You must provide us with a copy of the insurance policy naming us as loss payee. You may obtain property insurance from anyone you want that is acceptable to us.

6. **Tax Deductibility** – You should consult a tax advisor concerning the deductibility of interest or other charges related to the Account.

7. **Defaults, Account Termination** – If any of the following events occur, we may terminate your Account, accelerate the Maturity Date and the Account Balance, and require you to pay us the entire outstanding Account Balance in one payment, or take other lesser action and charge you certain fees: (a) You engage in fraud or material misrepresentation in connection with your Account; (b) You do not meet the repayment terms of this Agreement; or (c) Your action or inaction adversely affects the Property or our rights in the Property, including but not limited to the following: (i) You sell or transfer all or any part of the Property (or a beneficial interest in the Property is sold or transferred and Borrower is not a natural person) without our prior written consent, if you convey or assign (except for renting and leasing) or if you transfer, in whole or in part (other than a transfer to a spouse or an inter vivos trust, for which you are a beneficiary) all or any part of the Property without our prior written consent; (ii) You fail to keep the Property insured as we require; (iii) You permit a lien to be filed on the property senior to our Deed of Trust; (iv) You are the sole living Borrower under this Agreement and you die; (v) You fail to pay taxes on the Property when due; (vi) The Property becomes subject to taking through an eminent domain action; or (vii) A prior lien holder commences to foreclose its lien.

If any of the above events occur, we may also enforce the terms of the Deed of Trust securing your Account, including those terms which provide for foreclosure. At our option, we may demand that you immediately reimburse us for any expenses we incur as a result of your failure to fulfill any obligation under this Agreement or the Deed of Trust or we may add the amount of all such expenses to your Account Balance.

8. **Temporary Suspension of Account** – We may temporarily suspend credit privileges for your Account, refuse to make additional extensions of credit or reduce your Credit Limit if: (a) The value of the Property declines significantly below the appraised value the appraisal obtained when your Account was opened; (b) We reasonably believe you will not be able to meet the payment requirements of this Agreement due to a material change in your financial circumstances; (c) You are in default of a material obligation in this Agreement; (d) You experience an adverse change in your financial condition; (e) Government action; (f) prevents us from imposing the Annual Percentage Rate provided for in the Agreement or (g) impairs our security interest in the Property such that the value of our interest in the Property is less than 120 percent of your Credit Limit; (f) A regulatory agency has notified us that continued advances would constitute an unsafe and unsound practice; or (g) The maximum Annual Percentage Rate is reached.

If we temporarily suspend your Account or reduce your Credit Limit, we will send you notice of our decision at the address listed in this Agreement. (You should inform us of any change in your address.) During the suspension or credit reduction period you must continue to pay us at least your Minimum Monthly Payment. When the reason for which your Account was suspended or Credit Limit reduced ceases to exist, you may request reinstatement of your credit privileges by submitting the request to us in writing. Once you request reinstatement, we will investigate to determine whether the condition allowing the suspension or reduction continues to exist.

9. If the Property is located in California, the Deed of Trust that secures your obligations under the Agreement contains the following provisions for acceleration of the indebtedness evidenced by this Agreement.

**Transfer of the Property or a Beneficial Interest in Borrower**

If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Trustor is sold or transferred and Trustor is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Deed of Trust ("Deed") and this same date as this Deed. However, this option shall not be exercised by Lender if exercise is prohibited by applicable law or regulation, unless federal law preempts state law and exercise is permitted under federal law or regulation as of the date of the Deed. Without Lender's prior written consent, Lender shall have no obligation to provide any benefits under the Deed, including but not limited to any insurance coverage referred to herein, to any transferee of the Property or beneficial interest in Trustor. If Lender consents to such a transfer, Lender may charge Trustor and Trustor shall pay Lender a reasonable fee for the administration of such transfer as a condition of such consent.

If Lender exercises the acceleration option above, Lender shall give Trustor notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with the provisions for notice herein, within which Trustor must pay all sums secured by the Deed. If Trustor fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Deed, all without further notice or demand on Trustor. If Lender takes this action it is deemed the acceleration occurred.

10. **Cancellation of Account By You** – You may cancel your Account by a written notification to us. If we receive such a request from any party to this Agreement, we may, at our option and without notice to any other party, cancel your Account. The terms of this Agreement will continue to apply, however, until you have repaid all money you owe on the Account, provided, however, you will not be able to obtain further Advances under your Account.

11. **Check Handling** – If we terminate your Account or temporarily suspend your Account privileges, you agree to return all unused Checks to us upon our request. You may stop payment on a Check in the same manner you stop payment on any other check. We will not certify Checks. Notify us immediately

UBOCFLX (Rev. 7/2016)                    Original to Bank                    Page 4 of 5

creditors, consumer reporting agencies, and others who may properly receive such information. You understand that your Account fees and history, as well as information concerning this Account, may be reported and shared with others. We authorize us to obtain your image current name and address from the Department of Motor Vehicles or similar state agency, and for California residents, you specifically waive your rights in 2 and under California Vehicle Code 1808.21. We may also re-appraise the Property at anytime.

**13. Collection Costs** – You agree to pay all reasonable expenses, including attorney's fees and court costs, which we incur in collecting any amounts owed by you, in retrieving the unused Checks issued for your Account, or in enforcing the provisions of this Agreement, whether or not a lawsuit is filed.

**14. Interpretation and Construction** – We can waive or decline to enforce any of our rights under this Agreement at any time without losing those rights. This Agreement and all transactions arising hereunder will be governed by and interpreted in accordance with federal law and, to the extent not preempted by federal law, the law of the state where the Property is located. The foregoing sentence is not intended to limit the applicability of federal law to this Account, limit or waive the protections enjoyed by us under federal law; or to require us to comply with the laws of the state where the Property is located to the extent that those laws would be preempted by federal law in the absence of the preceding sentence. If any provision of this Agreement is held to be unenforceable, such determination shall not affect the validity of the remaining provisions of the Agreement. If this is a joint account, each of you can write Checks on this Account up to the full amount of the then available Credit Limit. Each of you will be jointly and individually responsible for all amounts due on the Account, regardless of which one of you wrote the Checks. Upon request by any party to the Account or upon receipt of inconsistent instructions, we may, at our option and without notice to any other party, refuse to pay any Check, or refuse any other request with respect to the Account.

**15. Change of Name, Address or Employment** – You agree to notify us promptly in writing if you change your name, address or place of employment.

**16. Changes to Agreement** – We reserve the right to amend (add to, delete or change) the terms of this Account only as allowed by law and will notify you as required by law. The unpaid Account Balance and any new Advance(s) will be subject to any such change. Any such change will result in an amended Agreement superseding all previous Agreements or amendments as applicable.

**17. Notice** – As required herein, notice to us shall be sent to the address shown on your latest Periodic Billing Statement, to be effective when received. Notice to you shall be sent to you at your address in our records, to be effective when deposited in the U.S. Mail, postage prepaid, unless otherwise stated in the notice.

### Your Billing Rights – Keep This Notice For Future Use

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us In Case Of Errors Or Questions About Your Bill**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, give us the following information:

- Your name and account number
- The dollar amount of the suspected error
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about

If you have authorized us to pay your bill automatically, from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us three business days before the automatic payment is scheduled to occur.

**Your Rights And Our Responsibilities After We Receive Your Written Notice**

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

By your signature and on the date below, you agree to all of the above terms and certify that you received a completed copy of this Agreement.

_Joander Kassab_     12-23-2016
JOANDARK KASSAB      Date

The undersigned non-borrowing title holder, as a trustee, acknowledges the terms of this Agreement as they apply to the lien of the Deed of Trust executed this same date:

_Joander K. Kassab_     12-23-2016
JOANDARK KASSAB Trustee OF THE KASSAB     Date
FAMILY 2014 TRUST DATED NOVEMBER 25,
2014

EXHIBIT B

**UnionBank**

## NOTICE OF TERMINATION

Direct         Union Bank, Puente Hills Branch
Inquires to:   17899 Colima Road
               City of Industry, CA. 91748
Phone:         626-810-3181

December 12, 2019

Joandark A. Kassab
10202 Challenge Blvd.
La Mesa, CA. 91941

Re: Home Equity Line of Credit – Account Number Ending in 4185

Dear Ms. Kassab:

This letter is to inform you that access to your available credit line has been terminated. Effective immediately, you will no longer have access to your line of credit, and we will not be able to honor any checks drawn against your account after this date.

The principal reason(s) for this decision is (are) as follows:
- Borrower's actions have had an adverse effect on the security interest

This termination of your account is authorized by your FlexEquity Credit Agreement and Truth in Lending Disclosure Statement executed by you on 12/23/16 and Federal law.

Also, the Bank will execute a Full Reconveyance and send it to the County Recorder to be recorded. Upon recording of the Full Reconveyance, the lien created by the Deed of Trust will be removed from the public record. The County Recorder will deliver to you a recorded copy of the Full Reconveyance.

If you have any questions regarding this letter, please contact your local Union Bank branch at the address listed above.

Sincerely,
Union Bank

NOTICE: You should know that the Federal Equal Credit Opportunity Act prohibits creditors, such as ourselves, from discriminating against credit applicants on the basis of their race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law concerning this creditor is the Bureau of Consumer Financial Protection, 1700 G Street NW, Washington DC  20006.

20193360920590